**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
CHARLIE APONTE and SEGUNDO LAZZO,
individually and on behalf of all others similarly
situated,

                    Plaintiffs,

           -against-


MODERN FURNITURE MANUFACTURING
COMPANY, LLC, WILLIAM KEARNY, and
ANTHONY SOLICITO,
                  Defendants.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
14-CV-4813 (ADS) (AKT)

<u>**APPEARANCES:**</u>


**Neil H. Greenberg & Associates, P.C.**
*Attorneys for the Plaintiffs*
4242 Merrick Rd
Massapequa, NY 11758
      By: Neil H. Greenberg, Esq.
         Justin M. Reilly, Esq., Of Counsel


**Mango & Iacoviello, LLP**
*Attorneys for the Defendants*
14 Penn Plaza, Suite 1919
New York, NY 10122
      By: Anthony G. Mango, Esq., Of Counsel


**SPATT, District Judge**.

      This case arises from claims by the named Plaintiffs Charlie Aponte ("Aponte") and

Segundo Lazzo ("Lazzo") and two opt-in Plaintiffs Angel Deleg ("Deleg") and Daniel Flores

("Flores" and collectively, the "Plaintiffs") that their former employers the Defendants Modern

Furniture Manufacturing Company, LLC ("Modern Furniture"); William Kearny ("Kearny");

and Anthony Solicito ("Solicito" and collectively, the "Defendants") violated the Fair Labor

Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and the New York Labor Law ("NYLL") by

allegedly failing to pay them proper overtime wages and retaliating against them for filing the present action.

Presently before the Court is a motion by the Defendants pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment dismissing this action in its entirety.

For the reasons set forth below, the Defendants' motion is denied in part and granted in part.

## I. BACKGROUND

The following facts are drawn from the parties' joint Local Civil Rule 56.1 statement unless otherwise noted. (See the Pls.' Sept. 14, 2015 Responses to the Defs.' 56.1 Statement, Dkt. No. 32–2 [the "Joint 56.1 Statement"].)

### A. The Parties

The Defendant Modern Furniture is a furniture manufacturing company presently located in Deer Park, New York. (Id. at ¶ 1.) It "fabricates commercial mica furniture in its shop located at the Deer Park premises," and its employees then deliver and install the furniture "on-site" at their customers' locations. (Id. at ¶ 2.)

The Defendant Kearny created Modern Furniture in 2005. (See Kearny's May 22, 2015 Dep., Mango Decl., Exs. 3, 4 ["Kearny Dep."], at Tr. 19:21–20:4.) From 2005 to 2014, he was a part owner of Modern Furniture and a general manager of the company. (See the Joint 56.1 Statement at ¶ 5; see also Kearny Dep. at Tr. 24:6–28:6; 27:13–20.) As general manager of Modern Furniture, Kearny had the power to hire and fire employees and to set employees' hourly rates of pay. (See the Joint 56.1 Statement at ¶ 9.)

From 2010 to 2014, Kearny sold all of his shares in Modern Furniture to David Cohn and Martin Cohn, neither of whom is a party to this action. (See Kearny Dep. at Tr. 24:6–28:6.) In

2013, Kearny created JAB Supply Company, LLC ("JAB"), a management and distribution company.  (Id. at Tr. 11:20–12:6.)  JAB subsequently entered into a management services agreement with Modern Furniture under which JAB manages Modern Furniture.  (See the Joint 56.1 Statement at ¶ 8.)  Thus, although he is formally employed by JAB, Kearny has continued to act as the general manager of Modern Furniture.  (See the Joint 56.1 Statement at ¶ 8; see also Kearny Dep. Tr. 28:3–15.)

Since at least 2009, the Defendant Solicito has been the director of operations for Modern Furniture.  (See the Joint 56.1 Statement at ¶¶ 11–12; see also Kearny Dep. Tr. at 86:23–87:7.)  In that role, he supervises the day to day operations of the employees at Modern Furniture.  (Id. at ¶ 13.)  He also has the power to hire and fire employee and set their rates of pay.  (Id. at ¶ 11.)

The Plaintiffs were all employed as factory workers and were paid hourly wages by the Defendants for the following periods of time: (i) Aponte worked for the Defendants on and off-again from November 29, 2005 to September 29, 2014, see the Joint 56.1 Statement at ¶¶ 15, 22; Lazzo worked for the Defendants on and off-again from May 2005 to January 6, 2015, see id. at ¶¶ 28–32; Deleg worked for the Defendants from November 4, 2013 to September 2, 2014, see id. at ¶¶ 34–36; and Flores worked for the Defendants from October 1, 2013 to July 16, 2014, see id. at ¶¶ 37–38.

## B. The Defendants' Purported Payroll Policies and Practice

Prior to this lawsuit, the Defendants did not have any written policies regarding overtime hours for its factory employees.  (See Kearny Dep. at Tr. 160:17–23.)  Nor did the Defendants have a practice of requiring employees to sign time sheets each week.  (Id. at Tr. 97:19–22.)

According to the Defendants, until 2010, employees were required to use a hand punch clock when they arrived and left the factory.  (See id. at Tr. 73:20–74:6; see also Joint 56.1

Statement at ¶ 44.)  After 2010, Solicito and Kearny apparently used an excel spreadsheet, instead of a punch clock, to record employees' daily time records.  (See Joint 56.1 Statement at ¶ 41.)  Solicito testified that employees would come into work; Kearny or Solicito would record the time on a Post-it note; and one of them would subsequently enter the employees' time into an excel spreadsheet.  (See Solicito's June 19, 2015 Dep., Mango Decl., Ex. D ["Solicito Dep."], at Tr. 40:19–16.)  Kearny or Solicito would then forward the spreadsheet to Accudata Payroll Services ("Accudata") for processing.  (See the Defs.' Feb 9, 2015 Responses to the Pls.' Interrogs., Reilly Decl., Ex. E, Dkt. No. 42–5 [the "Defs.' Responses to the Pls' Interogs."] at ¶ 11.)  The Defendants assert that Accudata then issued the Defendants' employees checks and directly deposited those checks into the employees' bank accounts.  (Id. at ¶ 16.)

Relying on their own testimony, the Plaintiffs dispute that after 2008, the Defendants had standardized procedures for recording their employees' hours.  (See the Joint 56.1 Statement at ¶¶ 42–43; see also Aponte Dep. Tr. at 135:2–7; Lazzo Dep. at Tr. 49:25–50:12; Deleg Dep. Tr. at 33:12–24; Flores Dep. at Tr. 26:12–27:9.)

The parties also dispute whether the Defendants implemented a general practice of discouraging employees to work overtime hours.  In support of their contention that the Plaintiffs did not work overtime, the Defendants offer what they contend are time card reports for each of the Plaintiffs for the years 2008 to 2009.  (See Mango's Dec. 9, 2015 Decl. [the "Mango Decl."] at Ex. N.)  They also offer an excel spreadsheet reflecting what they contend are the daily hours of the Plaintiffs for the years 2010 to 2014.  (See id. at Ex. C.)  These records purport to show that from 2008 to 2014, the Plaintiffs never recorded more than forty hours in a given work week.  (See id.)

4

The Defendants also rely on the deposition testimony of Kearny and Solicito. Specifically, Kearny testified that it was "general knowledge" within the company that "[i]f you are getting close to the forty hours you are to stop working and notify me or Anthony [Solicito], one of the managers." (Kearny Dep. at Tr. 157:16–158:3; 161:3–8.)  When asked if he could recall any weeks in which the Plaintiff Aponte worked more than forty hours, he testified:

> I would have to look at the records, but I think there was a time when we did a big job in the airport that he got paid overtime and a big bonus, but can I say it was him that day, I don't know . . . .  If he was on that project, which I believe he was, he got paid overtime.  Everybody on that project got overtime and a bonus.

(Id. at Tr. 163:10–22.)

Similarly, Solicito testified that when an employee, such as the Plaintiff Aponte, would get close to forty-hours in a work week, Solicito would "give him the option if he wanted to work the two hours to get the forty.  He had the option.  If he didn't, he could just then not come in." (Solicito Dep. at Tr. 56:23–58:9.)  In responses to the Plaintiffs' interrogatories, the Defendants acknowledged that sometimes their employees had to work on Saturdays and rarely on "Sundays and/or evenings" to meet the needs of their customers.  (See the Defs.' Responses to the Pls' Interrogs. at ¶ 17.)  However, if an employee had to work on a weekend, the Defendants asserted that the employee would take off another day during the week so that ultimately he or she did not work more than forty hours in any given work week.  (See id; see also Solicito Dep. Tr. at 59:7–12.)  The Defendants also claimed in their discovery responses that they sometimes permitted the Plaintiffs to work weekend days to make up for time that they missed during the week for personal reasons.  (See id.)  Thus, although the schedules of their employees were relatively flexible, the Defendants assert that the Plaintiffs did not, as a matter of general practice, exceed forty hours per week.  (See the Joint 56.1 Statement at ¶ 40.)

5

The Plaintiffs paint a different picture of the Defendants' payroll practices.  They assert, relying primarily on their own testimony, that the Defendants encouraged them to work more than forty hours each workweek.  (See the Joint 56.1 Statement at ¶¶ 40–41.)  They further contend that every week, the Defendants gave factory workers a check covering their wages for up to forty hours at their regular rate of pay and cash for all additional hours of work.  (Id.; see also the Pls.' Mar. 6, 2015 Responses to the Defs.' Interrogs., Reilly Decl., Ex. F [the "Pls.' Responses to the Defs.' Interrogs."] at ¶ 3.)  For example, the Plaintiff Aponte testified at his deposition:

> Q. So the pay stubs that you gave your lawyer, that's the pay that you got by check?
> A. Yeah. That's just a 40-hour pay, yeah.
> Q. Your testimony is that anything over that, you got paid in cash?
> A. Yes.
> Q. And how much would he [Kearny] pay you in cash?
> A. $14 — I mean 15 — it was sometime 14. Whatever rate I was making by the hours I was making.
> [. . . .]
> Q. So if you worked 53 hours, you're saying that the 13 hours, if you were making $14 an hour at that time, you got $14 times 13 hours in cash?
> A. Yes.

(Aponte's Apr. 16, 2015 Dep., Mango Decl., Ex. N ["Aponte Dep."] at Tr. 109:6–110:24.)

Similarly, Lazzo testified at his deposition:

> Q. And did you always get cash each week when you worked more than 40 hours?
> A. Yes.
> Q. Do you know if other employees got cash as well?
> A. Yes. All. Because — yes, because they sometimes would tell me that there was missing cash for that time that they had worked.

(See Lazzo's Apr. 16, 2015 Dep., Mango Decl., Ex. F ["Lazzo's Dep."] at Tr. 56:4–19.)

Deleg and Flores also testified that every week, the Defendants gave them checks representing up to forty hours of work at their regular rate of pay and that they paid them for any

6

additional hours worked in cash at their regular rate of pay.  (See Deleg's Apr. 16, 2015 Dep.,

Mang Decl., Ex. J ["Deleg Dep."] at Tr. 8:20–21; 36:21–23; see also Flores' Apr. 16, 2015 Dep.,

Mango Decl., Ex. K ["Flores Dep."] at Tr. 27:18–28:10.)

On this testimony, the Plaintiffs dispute that the time records submitted by the

Defendants are accurate because they contend that those records do not reflect the additional

overtime hours that they allegedly worked and for which the Defendants compensated them in

cash.  (See Joint 56.1 Statement at ¶¶ 41–45.)

## C. As to the Plaintiff Aponte

On November 29, 2005, the Defendants hired the Plaintiff Aponte as a factory worker at

a regular pay rate of $14 per hour.  (See the Joint 56.1 Statement at ¶ 15.)

On February 15, 2006, the Defendants suspended Aponte after he was arrested for

alleged drug dealing and charged with criminal possession of a controlled substance.  (Id. at ¶¶

16–17; see also Aponte Dep. at Tr. 22:6–10–24:12–24.) On February 28, 2006, the Defendants

re-hired Aponte for the same position at the same rate of pay.  (See Aponte Dep. at Tr. 29:12–

16.)

On January 3, 2008, Aponte resigned from his position because the Defendants refused to

pay him for holidays.  (See the Joint 56.1 Statement at ¶ 18; see also Aponte Dep. at Tr. 68:6–13;

Kearny Dep. at Tr. 42:10–15.)  On January 8, 2008, five days later, the Defendants re-hired him

for the same position at the same rate of day.  (See id.)

There are inconsistencies in the record regarding when in 2009 the Defendants terminated

Aponte's employment.  According to Kearny's testimony and the parties' joint 56.1 Statement,

the Defendants terminated Aponte's employment on January 28, 2009.  (See the Joint 56.1

Statement at ¶ 20; Kearny Dep. at Tr. 42:16–21.)  However, according to Aponte's testimony, on

February 27, 2009, and February 29, 2009, respectively, the Defendants issued warnings to

Aponte for using his cell phone during work hours and for not showing up to work.  (See Aponte

Dep. at Tr. at 86:6–88:6.)  The Plaintiff averred that it was at some unspecified point after he

received these warnings, that the Defendants terminated his employment.  (See id.)

Regardless, it is undisputed that on January 28, 2011, the Defendants re-hired Aponte,

again for the same position and the same rate of pay.  (See the Joint 56.1 Statement at ¶ 20.)  In

January 2014 and February 2014, respectively, Aponte received written warnings for walking off

the job and for unexcused absences.  (See Aponte Dep. at Tr. 90:2–93:11.)  On February 4, 2014,

based on this apparent misconduct, the Defendants again terminated Aponte's employment.  (See

the Joint 56.1 Statement at ¶ 20; see also Aponte Dep. at Tr. 94:12–95:9.)

On March 26, 2014, at his request, the Defendants again re-hired Aponte.  (See the Joint

56.1 Statement at ¶ 20.)  As a condition of his re-hiring, the Defendants required Aponte to sign

an "Employee Write-Up Notice, which stated:

> THIS IS AN AGREEMENT between [Charles Aponte] and [Kearny], that he
> above Charlie has asked for another chance to come back to work at the above
> company after he, Charlie, made some very poor choices and got fired.
>
> It is expressly understood by both parties that Modern with [sic] give Charles one
> final chance under the following conditions. AND it is also understood that if
> Charlie violates ANY rules and or this agreement Charlie will be terminated with
> good reason and NOT be entitled to unemployment insurance benefits.
>
> Charlie has been written up and fired a few times before and decided [sic]
> unemployment every time he, Charlie has applied for it.  Charlie has been fired
> and now is asking for his job back and agrees to all;
>
> 1. No more games, get in on time, no extra lunch times and leave on time.
> 2. No personal USE of your CELL phone at any time. While Driving, at Installs
> and or in Shop!!
> 3. No talk up the guys into wanting things they did not bring up. Tell any other
> employee that says anything to you to speak to Anthony or I directly . . . Do not
> play massager [sic].
> 4. Keep your work ethics to the highest regard and follow instructions given.

    5. Keep a neat clean appearance while out representing the company.
    6. Be totally dependable and NO BS any more LAST and FINAL CHANCE.

(Mango Decl., Ex. H; <u>see also</u> Aponte Dep. at Tr. 104:7–13.)

Aponte and Lazzo commenced this action on August 13, 2014.  (<u>See</u> Compl., Dkt. No. 1.)

At that time, Aponte was still employed by the Defendants.  (<u>See</u> the Joint 56.1 Statement at ¶

22.)

On September 19, 2014, the Plaintiff signed a written disciplinary warning for not

following a "build sheet on a countertop" and driving over the Defendants' inventory with a

forklift.  (<u>See</u> Aponte Dep. at Tr. 115:3–21.)

On September 22, 2014, Kearny received a notice of liability from the Suffolk County

Red Light Safety Program in the amount of $80 because, according to the notice, on September

11, 2014, Aponte, while driving a truck for the Defendants, ran a red light at an intersection

between Deer Park Avenue and Nicolls Road.  (<u>See</u> Mango Decl., Ex. I; <u>see also</u> Aponte Dep. at

Tr. 115:12–116:12.)  On the same day, the Defendants terminated Aponte's employment.

Aponte testified at his deposition that he had previously received traffic tickets for

parking violations while working for the Defendants, and in one instance, the Defendants' truck

was "towed away."  (<u>See</u> Aponte Dep. at Tr. 135:13–136:5.)  He did not receive any written

disciplinary notices from the Defendants for these tickets. (<u>Id.</u> at 136:11–14.)  Rather, according

to Aponte, "they just told me to be careful because those things happen."  (<u>Id.</u>)

Aponte testified that throughout his employment by Modern Furniture he generally

worked at least fifty-three and a half hours per week.  (<u>See</u> Aponte Dep. at Tr. 42:6–16; 43:15–

24; 127:3–7.)  This estimate was based on his own recollection and not any written records that

he or the Defendants kept.  (<u>Id.</u> at Tr. 43:21–44:8.)

Aponte also stated that throughout his employment, the Defendants would pay him and every other factory employee for overtime work in cash at his regular rate of pay, and not time-and-a-half.  (See id. a Tr. 110:13–111:13.)  He further testified that when he started working at Modern Furniture, he asked Kearny, "Do we get paid overtime, you know, time-and-a-half?"  (Id. at 108:18–21.)  According to Aponte, Kearny responded, "No. We pay you cash."  (Id. at Tr. 108:21–24.)  He also recalled complaining to Kearny several other times during the course of his employment about the wages the Defendants were paying him for overtime work.  (Id. at Tr. 106:14–23.)

**D. As to the Plaintiff Lazzo**

In 2001, the Plaintiff Lazzo was hired as a factory worker for "Modern Response," which was acquired by Modern Furniture in 2005.  (See the Joint 56.1 Statement at ¶¶ 24–25.)  There is a dispute of fact as to whether Lazzo agreed to continue his employment with Modern Furniture after the acquisition.  (See id. at ¶ 27.)  Kearny testified that Lazzo quit his position following the acquisition because Kearny refused Lazzo's request to be paid solely in cash.  (See Kearny Dep. at Tr. 39:12–24.)  Lazzo testified that he never made such a demand and continued working for Modern Furniture after the acquisition.  (See Lazzo Dep. at 9:25–10:8.)  Regardless, it is undisputed that as of May 12, 2005, Lazzo was again working for the Defendants.  (See the Joint 56.1 Statement at ¶ 29.)

On June 14, 2007, Lazzo quit his position at Modern Furniture because he obtained a different job that paid him more money.  (See id.)

On July 19, 2007, Lazzo asked the Defendants to re-hire him to his old position because the company he had previously worked for had "run out of work."  (Id. at ¶ 30.)

On May 23, 2008, Lazzo again quit his position with the Defendants for unspecified reasons.  (Id. at ¶ 31.)

On October 4, 2010, the Defendants re-hired Lazzo.  (Id. at ¶ 32.)  According to Lazzo's testimony, the Defendants agreed to pay him a regular wage of $18 per hour consisting of $14 per hour in a check and $4 per hour in cash.  (Lazzo Dep. at Tr. 19:8–20:16.)  In 2012, Lazzo testified that the Defendants gave him a raise from $18 to $19 per hour and began to pay him up to forty hours a week at that rate by check.  (Id. at Tr. 20:3–16.)  In 2013, the Defendants gave Lazzo another raise from $19 per hour to $22 per hour.  (Id.)

Lazzo testified, based on his own recollection, that since 2010, he generally worked for the Defendants for at least fifty-five to sixty hours per week.  (Id. at Tr. 42:18–21.)  He also proffered that with the exception of one period of two weeks, the Defendants never paid him more than his regular rate for his overtime hours and always paid him cash for those additional hours.  (Id. at Tr. 23:22–24:12; 55:23–56:4.)  Lazzo alleged that at the beginning of his employment with the Defendants, he complained to Solcito and Kearny about his overtime wages, and they purportedly told him that they were "paying us cash and that was it."  (Id. at 23:22–24:12.)

 As noted earlier, Lazzo and Aponte commenced this lawsuit against the Defendants on August 13, 2014, while they were still employed by the Defendants.  Lazzo testified that after filing the lawsuit, Kearny told him that "immigration would take me and my son away because I had worked with different names, and I never used different names, and said that his attorney would go against my son."  (Id. at Tr. 31:18–25.)

In October 2014, Kearny issued to Lazzo a written warning indicating that he violated a policy of Modern Furniture by not wearing safety goggles.  (Id. at Tr. at 36:15–37:14.)  In

11

November 2014, the Defendants hired another individual to "control the shop," a function that Lazzo allegedly used to perform.  (Id. at 35:2–7.)

 On January 6, 2015, Lazzo resigned from his position with the Defendants.  (See the Joint 56.1 Statement at ¶ 32.)

**E. As to Opt-in Plaintiff Deleg**

On November 2, 2013, the Defendants hired opt-in Plaintiff Deleg as a factory worker and paid him a regular wage of $15 per hour.  (Id. at ¶ 34.)  He testified that after he was hired, Solicito told him that the work schedule for factory workers was typically 7:30am to 4:30pm on Monday to Friday; and 7:00am to 12:00pm or 1:00pm on Saturdays.  (Deleg Dep. at Tr. 6:23–7:22.)  Thus, according to Deleg, he worked at least fifty hours each week.  (See id.)  He testified that each week, Kearny or Solicito would give him a check for forty hours of work and an envelope containing between $80 and $120 in cash.  (Id. at Tr. 8:18–25.)  Like Aponte and Lazzo, Deleg claimed that he did not have records of these cash payments.  (Id. at Tr. 9:3–6.)

On August 13, 2014, Deleg filed a consent form to become a party in this action pursuant to FLSA § 216(b).  That statute provides, in relevant part, that an action against an employer for violating the wage and overtime requirements of the FLSA may be initiated by "one or more employees for and in behalf of himself or themselves and other employees similarly situated"; and that an employee can become a party plaintiff to such an action by filing in court a "consent in writing to become such a party."  29 U.S.C. § 216(b).

On September 2, 2014, Kearny called Deleg into his office and asked him to sign a disciplinary warning.  (See Deleg Dep. at Tr. 15:17–16:3; Kearny Dep. at Tr. 229:21–230:10.)  According to his testimony, Deleg cannot speak English well and told Kearny, "I don't understand what I'm signing."  (See Deleg Dep. at Tr. 15:5–25.)  Deleg stated that Kearny

responded, "If you don't understand, then you have to leave. I don't care that you don't understand. You have to leave." (Id. at Tr. 15:24–16:3.) Deleg refused to sign the document and quit his job following the meeting. (Id. at Tr. 16:19–17:5.)

In this testimony, Kearny described the September 2, 2014 meeting with Deleg as follows:

> Angel Deleg quit because he was getting written up for dancing at his work station, which was recorded on the camera. I wrote him up and called him up to the office and showed him the video. Then he refused to sign. I told him he had to sign, he could write whatever he wants. He refused to sign. Then he started yelling in the office that he quit. He went in the shop and took his tools and left.

(Kearny Dep. at Tr. 229:25–230:10,)

## F. As to the Opt-in Plaintiff Flores

On October 1, 2013, the Defendants hired Flores as a factory worker and agreed to pay him a regular wage of $10 per hour. (See the Joint 56.1 Statement at ¶ 37.)

Flores testified that he generally worked from 7:00am to 4:30pm on Monday through Friday. (See Flores Dep. at Tr. 9:4–5.) He also stated that the Defendants required him to work on Saturday for varying hours, sometimes until as late as 9:00 or 10:00pm. (Id. at Tr. 9:16–20.) However, he stated that on a typical week, he worked forty-five hours per week. (Id. at Tr. 23:12–17.)

According to Flores, every week, the Defendants paid him a check for $372 and the rest in cash. (Id. at Tr. 7:6–18.) Flores said that the amount of cash he received each week varied depending on the amount of his overtime hours for that week, but he claimed that he never received more than $175 per week in cash and often received $50 in cash. (Id. at Tr. 28:7–29:17.)

13

It is undisputed that prior to joining this action, on July 16, 2014, Flores voluntarily resigned from his position at Modern Furniture.  (See the Joint 56.1 Statement at ¶ 39.)

## G. As to the Procedural History

As noted, on August 13, 2014, the Plaintiffs Aponte and Lazzo (collectively, the "Named Plaintiffs") commenced this action against the Defendants, asserting claims under the FLSA and NYLL for the Defendants' alleged failure to pay them adequate overtime wages.  (See Orig. Compl., Dkt. No. 1, at ¶¶ 53–81.)  They sought to conditionally certify a collective action pursuant to FLSA § 216(b) and a class action pursuant to Rule 23 consisting of "[a]ll persons who have worked as cabinet installers by the Defendants at any time from six years prior to the filing of this Action to the entry of judgment in this action."  (Id. at ¶¶ 48, 64.)  They also sought compensatory damages; declaratory relief; liquidated damages; pre-judgment interest; and attorneys' fees.  (Id. at 81.)

On August 13, 2014, the same day, Deleg and Flores filed consent forms pursuant to FLSA § 216(b) to opt-in to this action as party Plaintiffs. (See Dkt. Nos. 3, 4.)

On September 26, 2014, the Named Plaintiffs filed an amended complaint, which, among other things, added two claims for retaliation under the FLSA and the NYLL.  (See Am. Compl. at ¶¶ 64–76; 89–109.)

On October 17, 2014, the Defendants filed an answer generally denying the allegations in the amended complaint.  (See the Defs.' Oct. 17, 2014 Answer, Dkt. No. 12.)

On November 19, 2014, the Named Plaintiffs filed a motion to conditionally certify a collective action pursuant to FLSA § 216(b).  (See the Pl.'s FLSA § 216(b) Mot.,Dkt. No. 14.)

On December 13, 2014, the Court so-ordered a stipulation filed by the parties stating that the Plaintiffs were employed by Modern Furniture; Modern Furniture is "an enterprise engaged

in commerce or the production of goods in commerce" within the meaning of the FLSA; and for the relevant period of this case, Modern Furniture had a gross annual volume of sales or business done of at least $500,000.  (See the Dec. 13, 2014 Order, Dkt. No. 24.)

On December 22, 2014, the Court so-ordered a stipulation by the parties agreeing to the conditional certification of a collective action pursuant to FLSA § 216(b) for the purpose of sending notice and opt-in forms to employees and formers employees of Modern Furniture.  (See the Dec. 22, 2014 Order, Dkt. No. 27.)

On December 9, 2015, the Defendants filed a motion pursuant to Rule 56 for summary judgment dismissing this action.  (See the Defs.' Dec. 9, 2015 Mem. of Law, Dkt. No. 37–1 [the "Defs.' Mem. of Law"].)  In their memorandum, the Defendants assert that they are entitled to summary judgment on the Plaintiffs' overtime claims because they have offered what they contend to be accurate payroll records demonstrating that the Plaintiffs did not work overtime hours and were paid in full for their work, and the Plaintiffs have failed to raise a genuine issue of material fact that those payroll records are inaccurate.  (See id. at 9–13.)  They also assert that the Plaintiffs Lazzo, Deleg, and Flores have failed to make a *prima face* case of retaliation under the FLSA or the NYLL because they have not alleged that they suffered adverse employment actions, and the Plaintiff Aponte has failed to demonstrate that the Defendants proffered reason for firing him — namely, his disciplinary history — was pre-textual.  (See id. at 17–18.)

On January 25, 2016, the Plaintiffs filed a memorandum in opposition to the Defendants' motion.  (See the Pls.' Jan. 25, 2016 Opp'n Mem., Dkt. No. 43 [the "Pls.' Opp'n Mem. of Law"].)  They argue that the Defendants' payroll records contain inconsistencies, and the Plaintiffs' deposition testimony raises a genuine issue of material fact as to whether the records are accurate.  (See id. at 14–18.)  They further contend that they have made a *prima facie* case of

15

retaliation and demonstrated that the Defendants' proffered reason for terminating Aponte was pre-textual.  (See id. at 23–24.)

On February 8, 2016, the Defendants filed a reply memorandum that largely incorporates their previous arguments and disputes the alleged inconsistencies in their payroll records pointed out by the Plaintiffs.  (See Defs.' Reply Mem. of Law, Dkt. No. 44 [the "Defs.' Reply Mem. of Law"].)

The Court will now address the relevant legal standard; and the parties' arguments with respect to the Plaintiffs' overtime and retaliation claims.

## II. DISCUSSION

### A. The Rule 56 Legal Standard

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986), the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Anderson, 477 U.S. at 249, 106 S. Ct. 2505).  "The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Wright, 554 F.3d at 266 (parenthetically quoting Graham v. Henderson, 89 F.3d

16

75, 79 (2d Cir. 1996)).  However, to defeat a motion for summary judgment, the opposing party

"must do more than simply show that there is some metaphysical doubt as to the material facts, .

. . and may not rely on conclusory allegations or unsubstantiated speculation."  F.D.I.C. v. Great

Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks and citations omitted).

"When no rational jury could find in favor of the nonmoving party because the evidence

to support its case is so slight, there is no genuine issue of material fact and a grant of summary

judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d

Cir. 1994).

## B. As to the Plaintiffs' Overtime Claims

### 1. The Legal Standard

#### a. The FLSA

As noted earlier, it is undisputed that Modern Furniture is an employer subject to the

FLSA and that the Plaintiffs were employees protected by the provisions of the FLSA.

Under FLSA § 207, employers subject to the statute are required to pay covered

employees who work more than forty hours in a workweek "at a rate not less than one and one-

half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Where, as here, "an

employee is employed solely on the basis of a single hourly rate, the hourly rate is the 'regular

rate.'"  29 C.F.R. § 778.110(a).  Thus, "[f]or overtime hours of work the employee must be paid,

in addition to the straight time hourly earnings, a sum determined by multiplying one-half the

hourly rate by the number of hours worked in excess of 40 in the week."  Id.

"To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must

prove that he performed work for which he was not properly compensated, and that the employer

had actual or constructive knowledge of that work."  Kuebel v. Black & Decker Inc., 643 F.3d

352, 361 (2d Cir. 2011) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686–87, 66

S. Ct. 1187, 90 L. Ed. 1515 (1946)).

However, "at summary judgment, if an employer's records are inaccurate or inadequate,

an employee need only present 'sufficient evidence to show the amount and extent of [the

uncompensated work] as a matter of just and reasonable inference.'" Id. (alteration in original)

(quoting Anderson, 328 U.S. at 686–87, 66 S. Ct. 1187).  Under this relaxed standard, "an

employee's burden . . . is not high," id. at 362; and the employer may meet it by, for example,

offering "the testimony of a 'representative sample of employees,'" Hosking v. New World

Mortgage, Inc., 570 F. App'x 28, 31 (2d Cir. 2014) (Summary Order).  Further, "[i]t is well

settled . . . that it is possible for a plaintiff to meet this burden through estimates based on his

own recollection." Kuebel, 643 F.3d at 362 (collecting cases).

If a plaintiff meets this initial burden, "[t]he burden then shifts to the employer to come

forward with evidence of the precise amount of work performed or with evidence to negative the

reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails

to produce such evidence, the court may then award damages to the employee, even though the

result be only approximate." Id. at 362 (quoting Anderson, 328 U.S. at 687–88).

For example, in Kuebel, supra, the plaintiff, on behalf of himself and others similarly

situated, brought claims against his former employer, a manufacturer of power tools, for failing

to pay overtime wages to retail specialists paid by the hour.  Id. at 354–55.  The plaintiff was

required per company policy to record his hours on time sheets, and his time sheets did not

reflect that he earned any overtime.  See id. at 356.  However, he testified at his deposition that

he frequently worked overtime but did not record the extra hours due to pressure from

18

management.  Id.  He further estimated based solely on his own recollection that he worked one

to five hours of overtime every week and never recorded those hours.  Id. at 356–57.

On summary judgment, the district court determined that the plaintiff was not entitled to

the relaxed burden of proof because the plaintiff had falsified his own time sheets.  Id. at 361–62.

Applying the regular standard, the district court found that the plaintiff's testimony was

insufficient to raise a genuine issue of material fact that the defendants failed to compensate him

for overtime hours, and therefore, granted the defendant's motion for summary judgment.  See

id. at 358, 361–62.  On appeal, the Second Circuit reversed.  It disagreed with the district court's

finding that the plaintiff was not entitled to a relaxed burden of proof because the "plaintiff's

testimony —which must be credited at the summary judgement stage—was that he did so

because his managers instructed him not to record more than forty hours per week."  Id. at 363–

64.  The Court of Appeals reasoned that:

> A contrary conclusion would undermine the remedial goals of the FLSA, as it
> would permit an employer to obligate its employees to record their own time,
> have its managers unofficially pressure them not to record overtime, and then,
> when an employee sues for unpaid overtime, assert that his claim fails because his
> timesheets do not show any overtime.

Id.

Applying this relaxed standard to the facts in Kuebel, the Second Circuit found that the

plaintiff had met his initial burden by offering testimony that he "averaged one to five hours of

uncompensated overtime each week, and . . . specifically described his method of shaving

Friday's hours so that his weekly total did not exceed forty."  Id. at 364.  It also disagreed with

the district court's finding that the plaintiff's time sheets, the defendant's written policies, and

time records showing the plaintiff's low in-store hours, negated the inference that the plaintiff

had performed off-the-clock work.  Id. at 365.  Rather, the Circuit Court found the defendant's

evidence "raise[d] factual and credibility questions for trial."  Id.  It further found that the plaintiff's testimony that he complained to his supervisors that he was not being compensated for overtime was sufficient to raise a triable issue of material fact as to whether the defendant knew that he was working off the clock.  Id. at 365.

Accordingly, the Second Circuit vacated the portion of the district court's summary judgment order dismissing the plaintiffs' overtime claims and remanded the case for further proceedings.  Id. at 366–367; see also Deac v. Il Postino, Inc., No. 12-CV-5952 (NGG), 2014 WL 4437311, at *6 (E.D.N.Y. Aug. 15, 2014) (recommending that the court deny summary judgment on certain overtime claims based on testimony by the plaintiff restaurant worker that he often work passed his scheduled shift), *report and recommendation adopted*, No. 12-CV-5952 (NGG) (RLM), 2014 WL 4437314 (E.D.N.Y. Sept. 8, 2014); Sherald v. Embrace Techs., Inc., No. 11 CIV. 939 (TPG), 2013 WL 126355, at *6 (S.D.N.Y. Jan. 10, 2013) (finding that a plaintiff raised a genuine issue of material fact that he performed overtime work for which he was not compensated based on his testimony that he was not paid for work before and after scheduled shifts for the "majority of days").

### b. The NYLL

Like the FLSA, the NYLL requires employers to provide employees with time-and-a-half compensation at their regular rate of pay for work hours exceeding forty hours per week.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; see also Jemine v. Dennis, 901 F. Supp. 2d 365, 375 (E.D.N.Y. 2012) ("Like the FLSA, the Labor Law requires that employers provide time-and-a-half compensation for their employees; work hours exceeding forty per week, and adopts the same methods used by the FLSA for calculating overtime wages.").

Section 195 of the NYLL also requires employers to keep various detailed employment records.  Therefore, New York courts have applied the same burden shifting framework described above to NYLL claims where an employer has failed to keep adequate records.  See Awan v. Durrani, No. 14-CV-4562 (SIL), 2015 WL 4000139, at *10 (E.D.N.Y. July 1, 2015) (applying the FLSA burden shifting framework to NYLL claims); Marin v. JMP Restoration Corp., No. 09-CV-1384 CBA VVP, 2012 WL 4369748, at *6 (E.D.N.Y. Aug. 24, 2012) ("To determine NYLL overtime damages, courts use the same burden-shifting scheme employed in FLSA actions."), report and recommendation adopted in part, No. 09-CV-01384 (CBA) (VVP), 2012 WL 4364671 (E.D.N.Y. Sept. 24, 2012).

Further, the Court notes that the parties do not analyze the Plaintiffs' NYLL and FLSA overtime claims separately.  See Kuebel, 643 F.3d at 357 n. 1 ("The parties implicitly accept that conclusion on appeal and, like the district court, refer to federal law in analyzing Kuebel's [NYLL] claims. We will do the same.").

For these reasons, the Court treats the Plaintiffs' FLSA and NYLL overtime claims together for purposes of the Defendants' present motion.

**2. The Analysis**

Applying these standards, the Court finds that the Plaintiffs have raised triable issues of fact that they performed overtime work for which they were not properly compensated; and the Defendants had actual or constructive knowledge of that work.

As to the first element, the parties dispute whether the relaxed standard of proof applies to the Plaintiffs' overtime claims.  The Defendants contend that the time card reports they have produced for the years 2008 and 2009, and the Excel Spreadsheet for the years 2010 to 2014, satisfy their record-keeping duties under the FLSA and the NYLL.  (See the Defs.' Mem. of Law

at 12.) They further assert that these records are accurate and complete, and therefore, the Plaintiff should not enjoy a relaxed standard of proof. (See id. at 12–13.)

However, the Plaintiffs offer testimony suggesting that the records are not accurate or complete because they do not reflect their overtime hours. (See the Pls.' Opp'n Mem. of Law at 18.) They also produce text messages between the Plaintiffs and the Defendants purporting to show that the records themselves do not accurately reflect the Plaintiffs' work schedules. (See id. at 5–9.) The Court agrees that the Plaintiffs' testimony is sufficient to warrant the application of the just and reasonable inference standard, and therefore, does not address the other evidence offered by the Plaintiffs.

Each of the Plaintiffs testified at their depositions that every week, the Defendants Kearny or Solicito gave them a check for up to forty-hours at their regular rate of pay and an envelope containing cash for additional hours, which never compensated them at a rate of 1.5 times their regular rate of pay. (See Aponte's Dep. at Tr. 109:6–110:24; Lazzo Dep. at Tr. 56:4–19; Deleg Dep. at Tr. 8:20–21; Flores Dep. at Tr. 27:18–28:10.) The records submitted by the Defendants do not reflect these alleged additional hours, nor do they reflect any alleged cash payments made by the Defendants to compensate them for overtime hours. (See Mango Decl., Exs. C, N.) Thus, crediting the Plaintiffs' testimony— which the Court must do at this stage of the litigation —, a reasonable jury could conclude that the time records submitted by the Defendants are not accurate or complete because they did not account for the Plaintiffs' claimed overtime hours. See Kuebel, 643 F.3d at 363 ("[W]e hold that because Kuebel has presented evidence indicating that his employer's records are inaccurate . . . the district court should have afforded Kuebel the benefit of Anderson's 'just and reasonable inference' standard.").

22

Indeed, a contrary holding would permit an employer to never records its employees'
overtime hours, and then when an employee sued them for unpaid overtime, assert that the
employee's claim fails because his or her time sheets do not show any overtime.  Such a result
would, of course, thwart the remedial goals of the FLSA and the NYLL by permitting employers
to avoid the overtime requirement by selectively recording employees' work hours.  See id. at
363–64 ("A contrary conclusion would undermine the remedial goals of the FLSA, as it would
permit an employer to obligate its employees to record their own time, have its managers
unofficially pressure them not to record overtime, and then, when an employee sues for unpaid
overtime, assert that his claim fails because his timesheets do not show any overtime.").

Accordingly, the Court will apply the more relaxed just and reasonable inference
standard to the Plaintiffs' overtime claims.  Applying that standard, the Court finds that the
Plaintiffs' evidence clearly raises a just and reasonable inference that the Plaintiffs were not
properly compensated by the Defendants for their overtime work.  Aponte testified that
throughout his employment he worked at least thirteen and a half hours of overtime each week,
and the Defendants always compensated him cash at his regular rate of pay.  (See Aponte Dep. at
Tr. 42:6–16; 43:15–24; 127:3–7.)  Similarly, Lazzo testified that he worked at least ten to twenty
overtime hours per week and other than a two week period, the Defendants never paid more than
his regular rate of pay for those hours.  (See Lazzo Dep. at Tr. 23:22–24:12; 55:23–56:4.)

Deleg testified that he generally worked ten hours of overtime per week and generally
received cash compensation of between $80 and $120 per week.  (See Deleg Dep. at Tr. 8:18–
25.)  He claimed that his regular rate of pay throughout his employment was $15 per hour.  (See
id.)  Thus, according to his testimony, he never received time and a half compensation — which
at $15 per hour for ten hours, would equal $225 per week — for his overtime hours.  (See id.)

Finally, Flores testified that his regular rate of pay was $10 per hour; he typically worked forty-five hours per week, though sometimes a great deal more; and generally received cash compensation for his hours in the amount of $50.  (See Flores Dep. at Tr. 23:12–17; 28:7–29:17; see also Joint 56.1 Statement at ¶ 37.)  Thus, according to his testimony, he generally did not receive compensation of one and a half times his regular rate of pay — which at $10 per hour for five hours of overtime per week, would amount to $75 per week.

Although the Plaintiffs' testimony is not precise, it need not be under the just and reasonable inference standard described above.  Rather, it is well settled that a general estimate based on an employee's recollection gives rise to a just and reasonable inference of uncompensated work sufficient to shift the burden onto the employer to either demonstrate the precise amount of work the employee performed or negate the reasonableness of the inference. See Kuebel, 643 F.3d at 364 (finding that a plaintiff satisfied his initial burden at summary judgment based on a declaration in which he "estimate[d] that he averaged one to five hours of uncompensated overtime each week, and he has also specifically described his method of shaving Friday's hours so that his weekly total did not exceed forty"); Sherald. 2013 WL 126355, at *6 ("[A] defendant is not entitled to summary judgment under the FLSA simply because the plaintiff has not precisely quantified the amount of uncompensated work he has performed, so long as a genuine issue of fact exists as to whether some uncompensated work was performed, defendant's knew of this work, and a reasonable basis exists for calculating the amount of that work.").

For these reasons, the Court finds that the Plaintiffs' testimony as to the general amount of overtime hours they worked, and the Defendants' alleged practice of paying them for overtime

hours in cash representing less than 1.5 times their regular rate of pay is sufficient to shift the burden to the Defendants.

The Defendants seek to negate the inference arising from the Plaintiffs' testimony by relying on the time records they have produced showing that the Plaintiffs did not work overtime hours, and testimony by Kearny, Solicito, and Estafano Gregory, a former employee of the Defendants, suggesting that those time records are accurate.  (See the Defs.' Mem. of Law at 15–16.)

However, as described above, the Plaintiffs have offered credible testimony that these time records are not accurate because the Defendants had a practice of not recording overtime hours.  Thus, the Court finds that a reasonable jury could refuse to credit the records offered by the Defendants, and therefore, the fact that the time sheets do not show that the Plaintiffs worked overtime only serves to highlight what the Court finds to be a classic question of fact for the jury decide.  See Kuebel, 643 F.3d at 365 ("[T]hat [the plaintiff's] timesheets do not show any overtime does not resolve the central question necessitating a trial, which, as we have seen, is whether [the plaintiff] worked overtime but did not record it at his managers' behest.")

The Court is also not persuaded by the Defendants' contention that the Court should deny summary judgment because the Plaintiffs have "not produced any records or other evidence that support their allegations of having worked overtime[.]"  (See the Defs.' Opp'n Mem. of Law at 14.)

As described above, the Plaintiffs' testimony consistently suggests that they worked overtime hours that the Defendants intentionally failed to record to avoid paying the required overtime rate required under federal and New York law.  Under the just and reasonable standard, an employee's estimate of his or her overtime hours is sufficient to satisfy an employee's relaxed

burden on summary judgment.  Thus, the fact that the Plaintiffs have not produced records corroborating their testimony is of no moment at this summary stage.  Indeed, to hold otherwise, would improperly transfer the burden of record-keeping from Modern Furniture to the Plaintiffs, a result that is plainly contrary to the FLSA; the NYLL; and the law in this Circuit.  See Kuebel, 643 F.3d at 363 ("[I]t is important to recognize that an employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable."); Caserta v. Home Lines Agency, Inc., 273 F.2d 943, 946 (2d Cir. 1959) (Friendly, J) ("The obligation [to pay overtime] is the employer's and it is absolute. He cannot discharge it by attempting to transfer his statutory burdens of accurate record keeping, 29 U.S.C.A. 211(c), and of appropriate payment, to the employee.").

The Defendants further rely on several out-of-circuit cases.  These cases are not binding on this Court, and even if they were, the Court finds them to be distinguishable.  In Ihegword v. Harris Cty. Hosp. Dist., 555 F. App'x 372 (5th Cir. 2014), the plaintiff testified that the defendants required her to perform overtime work after she clocked out.  Id. at 375.  However, the defendants offered time card reports showing that the plaintiff hardly ever worked more than forty hours before clocking out, which was corroborated by the testimony of her co-workers.  Id. On appeal, the Fifth Circuit affirmed the decision of the district court that the defendants' evidence negated any inference of uncompensated work established by the plaintiff's testimony. See id.

By contrast in this case, the Defendants purported time card records consistently show that the Plaintiffs *did* work forty hours per week, and thus, do not negate the inference arising from the Plaintiffs' testimony that they worked off-the-clock hours in excess of what was contained in their time sheets.  Furthermore, the Plaintiffs have offered consistent and specific

26

testimony that the Defendants maintained a practice of requiring employees to work unrecorded overtime hours so that they would not have to pay them the required statutory rate for those hours.  Thus, the Court finds Ihegword to be inapposite.

The other cases cited by the Defendants involved testimony and evidence that did not contain a reasonable estimate of the plaintiffs' overtime hours and therefore, the courts found the evidence was too vague to give to rise to a just and reasonable inference of uncompensated overtime work.  See Carmody v. Kansas City Bd. of Police Comm'rs, 713 F.3d 401, 407 (8th Cir. 2013) (noting that the plaintiff-officers produced an investigation report, deposition testimony, and interrogatory responses which provided "no information" about what overtime hours, if any, the officers worked and were not compensated for); Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 441 (5th Cir. 2005) (affirming summary judgment dismissing overtime claims because the plaintiff made "no factual allegations at all to substantiate her claim, and she presented no evidence of the amount or the extent of hours she worked without compensation. Moreover, she presented no evidence that [the defendant] was aware that she worked overtime hours without compensation").

Here, the Plaintiffs have offered testimony that contains estimates for how many overtime hours they worked; the testimony also describes with some particularity the Defendants' alleged practices with regard to overtime — namely, paying employees cash under the table to avoid paying them for overtime work —; and the testimony describes when they allegedly complained to the Defendants about their uncompensated overtime work.  Thus, the evidence offered by the Plaintiffs here is more particular than the evidence at issue in the Defendants' cases, and therefore, does give rise to an inference of uncompensated overtime work.  See Kuebel, 643 F.3d at 362 ("It is well settled among the district courts of this Circuit,

27

and we agree, that it is possible for a plaintiff to meet this burden through estimates based on his own recollection.") (collecting cases).

Finally, although the Defendants do not appear to argue otherwise, the Court finds that the Plaintiffs have submitted evidence establishing, at the very least, a triable issue of fact as to the second element of an overtime claim — namely, that the Defendants had actual or constructive knowledge that the Plaintiffs were performing overtime work for which they were not being appropriately compensated.

Aponte and Lazzo testified that they asked Kearny and Solicito about overtime compensation, and Kearny and Solicito responded that the company did not pay overtime and would instead pay employees in cash at their regular rates of pay. (See Aponte Dep. at Tr. 108:18–24; Lazzo Dep. at Tr. 23.) Similarly, Deleg and Aponte testified that either Kearny or Solicito would set the employees' work schedules and would physically pay the employees. (See Aponte Dep. at Tr. 51:20–52:17; Deleg Dep. at Tr. 8:18–25.) Based on this testimony, the Court finds that a reasonable jury could conclude that the Kearny and Solicito had actual or constructive knowledge that the Defendants' employees were working uncompensated overtime hours. See Kuebel, 643 F.3d at 365 (finding that testimony by the plaintiff that he complained to his supervisor that his overtime hours were not being properly recorded was sufficient to create a triable issue of fact as to whether the defendant knew that the plaintiff was working off the clock hours).

In sum, the Court finds that the Plaintiffs have raised triable issues of fact as to whether they worked overtime hours and did not receive proper compensation for those hours; and that the Defendants were aware it. Accordingly, the Court denies the Defendants' motion for

summary judgment as to the Plaintiffs' federal and state overtime claims.

## C. As to the Plaintiffs' Retaliation Claims

### 1. Legal Standard

FLSA § 215(a)(3) makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). NYLL contains a similar provision. See N.Y. Lab. Law § 215(a).

The Second Circuit has held that retaliation claims under the FLSA and the NYLL are subject to the three-step burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). See Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010) (FLSA); Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) (NYLL).

"Thus, a plaintiff alleging retaliation under FLSA [or the NYLL] must first establish a *prima facie* case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA [or NYLL] lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Mullins, 626 F.3d at 53.

With regard to the second element, "[a]n employment action disadvantages an employee if 'it well might have 'dissuaded a reasonable worker from making or supporting [similar] charge[s] . . . .'" Id. (alterations in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006)). In making that determination, the Supreme Court has stated:

> Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

Burlington, 548 U.S. at 57, 126 S. Ct. 2405 (citations omitted).

For example, courts have found that a negative performance evaluation; a reduction in salary; or significantly diminished job responsibilities could reasonably dissuade an employee from engaging in protected activity.  See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 91 (2d Cir. 2015) ("Vega alleges that after he engaged in protected activity by filing a charge of discrimination with the EEOC in August 2011, he was assigned more students with excessive absenteeism records (jumping from 20% to 75%), his salary was temporarily reduced, he was not notified that the curriculum for one of his classes was changed, and he received a negative performance evaluation. Each of these allegations plausibly states a claim of retaliation."); Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) ("'A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'") (alteration in original) (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir.1993)).

With regard to the third element of a *prima facie* retaliation claim, "a causal connection between an adverse action and a plaintiff's protected activity may be established through evidence of retaliatory animus directed against a plaintiff by the defendant, or by showing that

the protected activity was closely followed in time by the adverse action." Mullins, 626 F.3d at

53 (internal citations and quotation marks omitted).  The Second Circuit "has not drawn a bright

line to define the outer limits beyond which a temporal relationship is too attenuated to establish

a causal relationship between the exercise of [protected activity] and an allegedly retaliatory

action." Littlejohn v. City of New York, 795 F.3d 297, 319 (2d Cir. 2015) (quoting Gorman–

Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001)).

"Once the plaintiff establishes a *prima facie* case of FLSA retaliation, the burden shifts to

the defendant to articulate a 'legitimate, non-discriminatory reason for the employment action.'"

Mullins, 626 F.3d at 53 (quoting Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)).

"If the defendant meets this burden, the plaintiff must produce 'sufficient evidence to support a

rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were

false, and that more likely than not discrimination was the real reason for the employment

action.'" Id. (quoting Weinstock, 224 F.3d at 42).

In addition, at least in the Title VII context, "a plaintiff alleging retaliation in violation of

Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a

'substantial' or 'motivating' factor in the employer's decision." Zann Kwan v. Andalex Grp.

LLC, 737 F.3d 834, 845 (2d Cir. 2013) (citing Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S.

Ct. 2517, 2526, 186 L. Ed. 2d 503 (2013)).  Although the Second Circuit has not explicitly

applied the "but for" causation standard to FLSA claims, lower courts have done so.  See Kubiak

v. S.W. Cowboy, Inc., 164 F. Supp. 3d 1344 n.30 (M.D. Fla. 2016) (applying "but for" causation

to FLSA claims because "there is no meaningful basis on which to distinguish the language in

Title VII's anti-retaliation provision and the language in the FLSA's provision"); White v. Cty.,

No. 4:13CV13, 2015 WL 5047955, at *12 (E.D. Tex. Aug. 26, 2015) ("The ultimate

determination in an FLSA retaliation case is whether the conduct protected by the FLSA was the 'but for cause' of the adverse employment decision."); Mould v. NJG Food Serv. Inc., 37 F. Supp. 3d 762, 778 n.11 (D. Md. 2014) ("In light of the Supreme Court opinions in Gross v. FBL Financial Services, Inc. and University of Texas Southwestern Medical Center v. Nassar, the Court interprets section 15(a)(3) of the FLSA as requiring a plaintiff in an FLSA retaliation case to prove, ultimately, that the plaintiff's protected activity was the 'but-for' cause of the challenged adverse action.").

Accordingly, the Court will apply the "but for" standard to the ultimate determination as to whether retaliation was the real reason for the alleged adverse employment actions taken against the Plaintiffs.

### 2. The Application

#### a. Flores

With regard to Flores, it is undisputed that he voluntarily resigned from his position as Modern Furniture on July 16, 2014, *prior to* August 13, 2014, when he joined this lawsuit.  (See the Joint 56.1 Statement at ¶ 38–39.)  Further, the Plaintiffs provide no evidence that the Defendants were even aware of Flores' intention to join this lawsuit prior to his resignation, let alone that he suffered any kind of adverse consequences as a result of that knowledge.  Thus, the Court finds that the Plaintiffs have failed to raise a genuine issue of material fact that the Defendants' resignation and his subsequent decision to join this lawsuit were causally connected and therefore, dismisses that claim.  See Pickett v. Baldwin Union Free Sch. Dist., No. 13-CV-3527(JS)(AYS), 2016 WL 1714928, at *3 (E.D.N.Y. Mar. 21, 2016) ("It is clear that '[t]here can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity.'") (quoting Pinero v. Long Island State Veterans Home, 375 F. Supp. 2d 162,

32

168 (E.D.N.Y. 2005)); Newell v. New York City Dep't of Transp., No. 08-CV-1369 (NG) (LB), 2010 WL 1936226, at *3 (E.D.N.Y. May 12, 2010) (same).

        **b. Deleg**

With regard to Deleg, the Plaintiffs contend that after Deleg joined this lawsuit, the "Defendants forced him to sign document that he did not understand and gave him an ultimatum that he had to sign the documents or leave." (See the Pls.' Opp'n Mem. of Law at 11.)

In that regard, Deleg testified that on September 2, 2014, Kearny called Deleg into his office and asked him to sign a disciplinary warning stating that he was caught on video dancing while working. (See Deleg Dep. at Tr. 15:17–17:5.) According to Deleg, after he told Kearny he did not understand what the notice said, Kearny responded, "If you don't understand, then you have to leave. I don't care that you don't understand. You have to leave." (Id. at Tr. 15:24–16:3.) Deleg refused to sign the document and quit his job following the meeting. (Id. at Tr. 16:19–17:5.)

  "[D]isciplinary warnings do not *per se* constitute a disadvantageous employment action," where they are consistent with a pre-existing disciplinary policy. Pierre v. Air Serv Sec., No. 14CV5915 (MKB) (ST), 2016 WL 5136256, at *8 (E.D.N.Y. Sept. 21, 2016); see also Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006) ("The application of the FDA's disciplinary policies to Joseph, without more, does not constitute adverse employment action."); Chang v. Safe Horizons, 254 F. App'x 838, 839 (2d Cir. 2007) (Summary Order) (finding that oral and written warnings consistent with the company's personnel policy did not constitute "materially adverse" actions for purposes of a retaliation in the view of a "reasonable employee").

Here, it is not clear that Kearny's attempt to give Deleg a warning would have disadvantaged him because he quit instead of signing the warning. Thus, the Court is hard

pressed to conclude that the warning, by itself, would have dissuaded a reasonable employee from joining this lawsuit.  See Thomson v. Odyssey House, No. 14-CV-3857 (MKB), 2015 WL 5561209, at *21 (E.D.N.Y. Sept. 21, 2015) ("As for Brown's warning, a disciplinary warning letter may constitute an adverse action in the retaliation context. However, the allegations seem to indicate that the warning was merely 'advi[ce]' and not intended as discipline, reprimand or a threat thereof, and thus the Court cannot conclude that it was 'materially adverse.'") (citation omitted).

Furthermore, Deleg has made no showing that Kearny's proffered reason for the warning — namely, that he was dancing while working — was more likely than not pre-textual.  There is, for example, no testimony that Kearny made comments or took actions against Deleg prior to the September 2, 2014, that suggested that he was even aware of the fact that Deleg had joined in the action.  In addition, Deleg testified that he had been written up by Kearny in March 2014 for talking to his co-workers and misapplying a laminate on a job.   (See Deleg Dep. at Tr. 13:17–10.)  The fact that Deleg had been issued disciplinary warnings before he joined this action suggests that Kearny was not in fact motivated by retaliatory animus when he issued another warning on September 2, 2014.  See Inguanzo v. Hous. & Servs., Inc., 621 F. App'x 91, 92 (2d Cir. 2015) (Summary Order) (affirming summary judgment dismissing the plaintiff's retaliation claim because "the record in this case reflects that before [the plaintiff] complained of discrimination, she had received a stream of disciplinary warnings regarding her lateness in filing records."); Pierre v. Air Serv Sec., No. 14CV5915 (MKB) (ST), 2016 WL 5136256, at *9 (E.D.N.Y. Sept. 21, 2016) ("Judge Tiscione correctly found that Plaintiff failed to prove any causal connection between Plaintiff's protected activity and adverse employment action as

Plaintiff was disciplined before he complained to Defendant, and there was no evidence that Plaintiff was terminated because of his complaints.").

Therefore, the Court finds that even assuming *arguendo* that Deleg made a *prima facie* case of retaliation arising from Kearny's attempt to get him to sign a disciplinary warning, he has failed to put forth evidence from which a reasonable juror could conclude that the warning would not have occurred in the absence of a retaliatory motive.

Accordingly, the Court grants the Defendants' motion for summary judgment dismissing Deleg's retaliation claims under the FLSA and the NYLL.

### c. Lazzo

Unlike Deleg and Flores, the Plaintiffs provide more direct evidence of retaliation against Lazzo. Specifically, Lazzo testified that after he filed this action, from August 13, 2014 to January 6, 2015, he had six or seven discussions with Kearny regarding this litigation. In those conversation, Lazzo testified that Kearny told him that "immigration would take me and my son away because I had worked with different names . . . , and he said that his attorney would go against my son." (See Lazzo Dep. at Tr. 32:10–22.) He also stated that Kearny asked him multiple times not to take part in the lawsuit and described Kearny as always being "upset" with Lazzo after he filed suit. (See id. at Tr. 32:13–18.) In addition, Lazzo testified that in October 2014, Kearny forced him to sign a disciplinary warning for not wearing safety goggles; and in November 2014, the Defendants hired another individual to "control the shop," which was a function that Lazzo had previously performed. (Id. at 35:2–37:14.)

Crediting Lazzo's testimony as true, the Court finds that Kearny's threats to report Lazzo and his son to the immigration authorities would, by themselves, dissuade a reasonable employee from participating in this lawsuit, and that these threats were directly related to Lazzo's decision

to participate in this law suit.  See Bartolon-Perez v. Island Granite & Stone, Inc., 108 F. Supp.

3d 1335, 1339 (S.D. Fla. 2015) (finding that an employee's declaration stating that his employer

threatened to report him to immigration authorities in response to bringing an overtime claim

was sufficient to show a *prima facie* case of retaliation under the FLSA); Perez v. Jasper

Trading, Inc., No. 05CV1725(ILG)(VVP), 2007 WL 4441062, at *3 (E.D.N.Y. Dec. 17, 2007)

(finding a *prima facie* case of retaliation under the FLSA where "[i]n response to the plaintiffs'

requests, and for the purpose of discouraging the plaintiffs from pursuing their rights, the

defendants threatened to contact governmental and immigration authorities if the plaintiffs

continued to demand just compensation").

Furthermore, although likely too vague in isolation to constitute adverse employment

actions, when viewed through the prism of Kearny's direct threats to Lazzo in response to this

litigation, the Court finds that the Defendants' actions in issuing Lazzo a disciplinary warning

and in reducing his apparent control over the factory floor provide further evidence from which a

juror could reasonably infer a retaliatory motive on the part of Kearny and the Defendants.  See

Galabya, 202 F.3d at 640 (noting that "[a] materially adverse change might be indicated by. . .

significantly diminished material responsibilities, or other indices . . . unique to a particular

situation").

Therefore, the Court finds that Lazzo has met his *prima facie* burden of establishing

retaliation under the FLSA.  Further, the Defendants have not proffered any legitimate non-

retaliatory reason for the above-actions.  (See the Defs.' Mem. of Law at 17–18.)  Accordingly,

the Court finds that Lazzo has raised a genuine issue of material fact precluding summary

judgment on his retaliation claims.

### d. Aponte

Finally, the Defendants do not dispute that Aponte has made a *prima facie* case that his termination on September 22, 2014 was causally connected to his decision to file this action on August 13, 2014.  (See id. at 18–19.)  However, they offer a legitimate non-discriminatory reason for his termination — namely, that he signed a last chance agreement after the Defendants agreed to re-hire him on March 26, 2014, and he violated that agreement when on September 22, 2014, he received an $80 traffic ticket for running a red light while driving a company truck. (See the Defs.' Mem. of Law at 18.)

In response, the Plaintiffs contend that the Defendants' decision to fire Aponte was pre-textual.  (See the Pls.' Mem. of Law at 24.)  In support, they offer the Plaintiffs' own testimony that prior to the September 22, 2014 incident, he had received tickets for parking violations and as a result, in one instance, the Defendants' truck was towed away.  (See Aponte Dep. at Tr. 135:13–136:5.)  However, he testified that the Defendants did not give him written warnings for those tickets.  (See id.)

The Court finds that a reasonably juror could find, based on this testimony, that the Defendants' proffered reason for terminating him was pre-textual.  See Zann Kwan, 737 F.3d at 846 ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.").  That is particularly so given the relative close temporal proximity between Aponte's decision to file this action on August 13, 2014 and the Defendants' decision to termination him a little over a month later on September 22, 2014.  See id. ("[A] plaintiff may rely on evidence comprising her

*prima facie* case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage."); Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) ("Under some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination.") (citing Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000)).

Accordingly, the Court finds that the Plaintiffs have raised a genuine issue of material fact precluding summary judgment on Aponte's retaliation claims.

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is denied with regard to all of the Plaintiffs' FLSA and NYLL overtime claims; denied with regard to the FLSA and NYLL retaliation claims of Lazzo and Aponte; and granted solely with regard to the to the FLSA and NYLL retaliation claims of Flores and Deleg.

**SO ORDERED.**
Dated: Central Islip, New York
September 24, 2016

  *Arthur D. Spatt*
 ARTHUR D. SPATT
United States District Judge